## Butler et al. v. Pennsylvania Railroad Company.

*Doty & Thornton* and *William L. Henry,* for plaintiffs.

*Dalzell, Dalzell & McFall,* for defendant.

GRAY, J., July 11, 1930.—There were verdicts for the plaintiffs in the sum of $250 for each of them.

On the evening of Sunday, January 13, 1929, the plaintiffs, two young men, went from Pittsburgh to Canonsburg on a bus, leaving Pittsburgh at 7.30 o'clock, for the purpose of calling upon two young ladies. On arrival at Canonsburg at about 8.22 P. M., one of the plaintiffs called one of the young ladies whom they were about to visit on the telephone from a drug store, and on their route to make their call they stopped at the station of the Pennsylvania Railroad, and, according to their testimony, entered the waiting room for the purpose of making inquiry as to trains to Pittsburgh later in the evening. Their testimony is that the ticket window was closed. The testimony on behalf of the defendant is that it was open, but as the ticket agent went out on the platform to meet the 8.17 train from Pittsburgh on which the defendant's officers arrived, we are of the opinion the jury were right in finding that the ticket window was not open when the plaintiffs entered. No doubt it was opened later when the ticket agent entered the station with the officers, whom he let into the baggage room, where they stayed observing the crowd in the waiting room. Plaintiffs testified that when they entered they found a group of young men formed in two lines. Craig walked around the line and to the ticket window, and finding it closed looked around for schedules or someone to whom he might make inquiry as to the running time of trains, when he was told by Elder, a railroad police officer, to get back into line. He protested against this order, and according to his testimony Officer Whetsel told Elder that Craig had just come in the door with Butler, and Butler was pointed out at the door of the waiting room as the one who had just entered the waiting room with Craig. According to Craig, he asked Elder what he was arrested for and he told him he would find out later, and both he and Butler were forced into line with the other men, perhaps about twenty, and marched to the police station by the four officers of defendant who were present and who had called the Canonsburg police who had come down to help the officers detain the group of men in the station. Plaintiffs were placed in cells in the police station, where they stayed for about an hour, until friends came and posted $10 forfeits for them. The next morning they were given a hearing on an information made against them by Elder, one of the railroad policemen, charging them with a violation of the Act of Assembly of April 14, 1905, P. L. 169, amended by the Act of May 23, 1923, P. L. 326. After a hearing at which two of the railroad policemen of defendant who made the arrest testified, as did the defendant's station agent at Canonsburg, plaintiffs were discharged on the ground of insufficient evidence to sustain the charge made against them.

From the testimony on behalf of the defendant it appears that for some time preceding the evening in question complaints had been made to the borough police by the defendant's station agent about the conduct of a crowd of young men who made a practice of loitering in the waiting room of defendant's station, especially on Sunday nights, the objectionable conduct consisting of offensive language and reported insults to women who came into the station for the purpose of taking a train or transacting other business there. It appears the police of the Borough of Canonsburg had made some effort to stop the nuisance, but unsuccessfully, and the station agent who testified at the hearing had reported this condition to the railroad police employed by the defendant, or some of them, and the four who went to Canonsburg and arrested the plaintiffs went there on their own initiative, having first notified the Canonsburg police and asked for their coöperation. It appears the assistant to the station agent was in charge of the station at the time. He met the

railroad policemen, and at their request let them into the baggage room of the station where they could observe the conduct of the crowd. One of the officers participating in the arrest did not at the time have a commission from the Governor as a railroad policeman, or if he did, it was not recorded in Washington County, as required by law, the arrest having taken place in Washington County. One of the railroad officers admitted that the badge required by law to be worn was not worn by him in plain view, but was on his vest under his coat, where it could not be seen. There is no testimony that the other officers wore badges, or if they did, where they wore them. Three of the arresting officers had commissions from the Governor and their commissions were properly recorded in Washington County.

The sole basis for the motions for judgment *non obstante veredicto* is that the arresting officers were acting as public police officers in maintaining the public peace and order, and that, therefore, the defendant company is not responsible for their actions.

The contention of the plaintiffs is that while three of the officers were commissioned railroad police, they were acting in a private capacity as agents of the defendant in the protection of its property at the instigation of an employee of defendant and within the scope of their authority as employees of defendant, and that, therefore, defendant is liable for the arrest and imprisonment of plaintiffs by these four officers.

In the act of assembly hereinbefore cited, which it was charged plaintiffs had violated, in section one thereof, it is provided that it shall be "unlawful for any person wilfully to enter upon any land, within the limits of this Commonwealth, where the owner or owners of said land has caused to be prominently posted upon said land printed notices that the said land is private property, and warning all persons from trespassing thereon, under the penalties provided in this act."

Section two provides that violators of this law "shall be liable to a penalty of not exceeding ten dollars, together with the costs of prosecution, to be recovered before any magistrate or justice of the peace, as fines and penalties are by law recoverable; and, in default of payment of said fine and costs, the party convicted shall be committed to the county jail."

Section three provides that such penalties "shall be paid to the school fund of the district in which the trespass was committed."

We learn from the Act of April 15, 1835, P. L. 291, and from the Act of April 5, 1849, P. L. 409, that suits for the recovery of fines and penalties may be maintained before any justice of the peace or alderman in like manner as suits for debts under the sum of $100 may be maintained.

And from the Act of March 20, 1810, 5 Sm. Laws, 161, and the Act of July 12, 1842, P. L. 339, section 24, in cases where execution cannot be issued against the body of defendant, actions before justices of the peace shall be begun by summons.

By the Act of January 12, 1705, 1 Sm. Laws, 25, section 4, it is enacted that:

"No person or persons, upon the first day of the week, shall serve or execute, or cause to be served or executed, any writ, precept, warrant, order, judgment or decree, except in cases of treason, felony or breach of the peace; but that the serving of any such writ, precept, warrant, order, judgment or decree shall be void, to all intents and purposes whatsoever; and the person or persons so serving or executing the same shall be as liable to the suit of the party grieved, and to answer damages to him for doing thereof, as if he

or they had done the same without any writ, precept, warrant, order, judgment or decree at all."

The officers who made the arrest in this case were commissioned and employed by the defendant pursuant to the Act of February 27, 1865, P. L. 225, which provides that the Governor may issue commissions to what are called railroad policemen, to be employed and paid by the railroad making application for such appointment. This act requires the commissioned policeman to take an oath of office before a recorder of deeds and that a certified copy of this oath with the commission shall be recorded in every county through or into which the railroad for which such policeman is appointed may run, and in which it is intended the said policeman shall act; and such policemen, so appointed, "shall severally possess and exercise all the powers of policemen of the city of Philadelphia, in the several counties in which they shall be so authorized to act as aforesaid." Said act further provides that, "Such railroad police shall, when on duty, severally wear a metallic shield, with the words 'railway police,' and the name of the corporation for which appointed inscribed thereon, and said shield shall always be worn in plain view, except when employed as detectives."

This recitation of the law reveals that the arrest of the plaintiffs by the four commissioned officers employed and paid by defendant on Sunday was wholly illegal and unauthorized by law. These two plaintiffs were not members of any group which had annoyed defendant's employees and patrons nor the public. They were not residents of Canonsburg. They were in no sense responsible for the complaint which had been made to the defendant's officers for invasions of the defendant's property at Canonsburg. They were guilty of no offense, of no violation of the public law, nor any trespass on the defendant's property. They went into the defendant's station for a perfectly legitimate purpose and were arrested and imprisoned without any inquiry made of them as to the reason for their presence there, without any opportunity to make an explanation, and against their protests. They were deprived of their liberty, locked in cells in a police station, required to give a forfeit for their appearance, and a charge made against them of trespassing on defendant's property, from which charge they were exonerated because defendant's employees could not offer any testimony against them. There is no justification for their arrest and imprisonment, and it was illegal from beginning to end. They were outraged without any legal or other excuse.

The defendant desires to escape responsibility on the ground that these officers employed and paid by it, who had commissions from the Governor of the Commonwealth, were presumptively acting in their public capacity, were in fact exercising a public employment for the redress of a wrong against the public, and that they were exercising no private employment for the defendant for the protection of its property or the furtherance of its business. Counsel for defendant relies upon the authority of Naugle v. Penna. R. R. Co., 83 Pa. Superior Ct. 528, and upon Fagan v. Pittsburgh Terminal Coal Corp., 299 Pa. 109, and Bunting v. Penna. R. R. Co., 284 Pa. 117.

After consideration of these and other well-known cases, we have come to the conclusion this case is rather to be governed by the principles recited in Tufshinsky v. P. C. C. & St. L. Ry. Co., 61 Pa. Superior Ct. 121; Finfrock v. Northern Central Ry. Co., 58 Pa. Superior Ct. 52, and Kayser v. Penna. R. R. Co., 10 D. & C. 799, and that defendant should be held responsible for the acts of the officers. The four officers who made the arrest and caused the imprisonment were stationed at Pittsburgh and went from Pittsburgh

to Canonsburg for the purpose of observing conditions at the defendant's Canonsburg station and preventing objectionable conduct in that station by persons who had been reported to be loitering in the station and annoying intending passengers. One of the men making the arrest was not authorized to act as a railroad policeman in Washington County on the day in question, because if he had a commission it was not recorded there as required by law, and there is testimony he had no commission at the time. One of the other officers was not wearing his shield in plain view, as required by law when on duty, and, therefore, it may rightfully be concluded he was not on duty at the time as a commissioned officer under the law. There is no proof that the other two officers were wearing their shields as required by law, and as it was incumbent upon defendant to prove that these employees of it were acting as public policemen, if it wished to be exonerated from responsibility for them, and it did not offer any such proof, it might well be concluded that none of these officers were qualified to act as public policemen under the law, and, therefore, were not so acting. The proof is, and we may assume the finding of the jury was, that the four officers left Pittsburgh without any orders from any superior officer and without the knowledge of any superior officer, on their own volition, to answer the call of the station agent of defendant at Canonsburg, that the defendant's business there was being interfered with and its property trespassed on by a group of idlers who congregated in defendant's station and annoyed intending passengers. The officers notified the Canonsburg police of their intended business, but did not notify the attendant in charge of defendant's station at the time, but he was present at the time the train on which the officers traveled arrived, and assisted them in their project in secreting them in the baggage room, he himself taking part in observing the crowd. The defendant's officers arrested and restrained the two plaintiffs along with a large group of men in the station and then the local police joined them and the defendant's officers and the local police marched the plaintiffs and the others along the thoroughfares of Canonsburg to the police station, where they were locked in cells, and at the instigation of one of the defendant's officers compelled to make a deposit of $10. After an hour or so in the cells they were able to enlist friends who provided forfeits for them and they were released until next morning. One of defendant's officers made charges against the plaintiffs of trespassing on defendant's property contrary to the terms of the Act of 1905 hereinbefore stated, and as stated, at the hearing two of defendant's officers and the defendant's station agent, who was not present the evening before, testified against plaintiffs, and notwithstanding this they were discharged.

It should be noted that the Act of 1905 does not make it a crime to trespass on posted premises, but provides for a small penalty which, according to law, must be recovered in a civil action before a justice of the peace or alderman. Plaintiffs, therefore, were not charged with the commission of a crime, although in form a criminal charge was made against them. They were arrested and discharged as criminals. They had committed no offense against the public and were not charged with any offense against the public. Defendant's own employees, who happened to be commissioned as railroad policemen, charged plaintiffs with trespassing upon defendant's premises contrary to a statute which is manifestly for the benefit of owners of real estate, and not for the public benefit. There was no proof that the defendant's premises were prominently posted with printed notices that they were private property warning persons against trespassing thereon, as provided by the Act of 1905. The only testimony offered by the defendant on this subject was that the

premises were posted with "No trespassing signs." This is certainly insufficient to show they were posted in such a way as to warrant the charge made against the plaintiffs, even if they had been guilty of trespassing, which the jury found they were not. As stated in Finfrock v. Northern Central Ry. Co., *supra*, "The *prima facie* presumption that such officer acted solely on his own accord as a peace officer may be rebutted by evidence warranting the jury in finding that he was at the time engaged in special service for the company, such as guarding its property or enforcing obedience to its rules. If in such case it appears that the wrongful act was within the scope of such special service or employment, the fact that he also held a commission from the state will not bar recovery from the company."

And again in that case the court said: "Another qualifying principle recognized by the decisions is, that the railroad company may be held liable for the wrongful act of the policeman if it was instigated by the company or by some of its officers or employees acting within the scope of their employment."

We are of the opinion there was sufficient evidence to warrant a finding that the officers were engaged in a special service for the defendant in the protection of its property and that their acts were in the scope of the special employment, and, also, that the acts of the officers were instigated by an employee of the defendant within the scope of his employment.

In the Fagan case the Supreme Court, in reversing the judgment of this court, among other things, said: "The conduct complained of was criminal in its nature, committed in their presence on the public highway, and to restrain its continuance they could act without warrant."

And again the court said: "In the present case, the arrest was not made to protect the property of the company, to compel obedience to any of its rules, or made at the instigation of its authorized employees."

And again the court said: "Plaintiff was here charged with a criminal offense and arrested by duly authorized officers."

And again the court said: "The disorderly conduct occurred on a public highway, and there was no evidence to show that the company directed, instigated or took part in the apprehension or detention of Fagan. It was not made because of a violation of the rules of the coal company, or to protect its property, nor does it appear that any wrongful act was ratified by the defendant or one acting with its authority for it."

The distinction between the Fagan case and the present appears from the recital of the testimony already given.

In Tufshinsky v. P., C., C. & St. L. Ry. Co., *supra*, an umbrella mender about sixty years of age was seated in the waiting room of defendant's station waiting for a train. He was eating his lunch and dropped crumbs on the floor of the station. A duly authorized police officer of the defendant arrested him and took him to the office of a justice of the peace, in whose office he was detained for several hours. The justice, on the testimony of the officer, committed him to the jail on a charge of disorderly conduct and fined him $5 and costs. There was no evidence of disorderly conduct or that plaintiff resisted arrest, although the arresting officer attempted to make out a case of disorderly conduct against the man arrested. A judgment for the plaintiff was affirmed, as it seems to us the judgment in this case should be.

## Order.

And now, to wit, July 11, 1930, the motion for judgment *non obstante veredicto* is denied. <span>From William J. Aiken, Pittsburgh, Pa.</span>